IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION FILE NO. |
| v. | 1:16-CR-145-TWT-JKL-3 |
| MANGWIRO SADIKI-YISRAEL (3) | |

## ORDER AND NON-FINAL REPORT AND RECOMMENDATION

This Order and Report and Recommendation addresses the following pending motions filed by Defendant Mangwiro Sadiki-Yisrael:

– Defendant's Motion for Bill of Particulars [Doc. 751]

– Defendant's Motion to Disclose Confidential Informants [Doc. 1007]

– Defendant's Motion to Sever [Doc. 1008]

– Defendant's Motion to Suppress Evidence [Docs. 1010, 1020]

For the reasons that follow, it is **ORDERED** that the Motion for Bill of Particulars [Doc. 751] and Motion to Disclose Confidential Informants [Doc. 1007] be **DENIED**.  It is also **RECOMMENDED** that the Motion to Sever [Doc. 1008] and the Motion to Suppress Evidence [Docs. 1010, 1020] be **DENIED**.

## I.    BACKGROUND

Sadiki-Yisrael is charged in this case with RICO conspiracy (Count One). [*See* Doc. 1.]  The indictment alleges that Sadiki-Yisrael was a member of the Gangster Disciples, which the government alleges operated as a racketeering enterprise as defined by 18 U.S.C. § 1961(4).  During the time period relevant to this case, Sadiki-Yisrael allegedly held the positions of "First Coordinator of the Marietta Count," "Assistant Governor of Georgia," and "Governor of Georgia," positions of local and state authority within the Gangster Disciplines.[1]  [*Id.* at 3, 11.]  The indictment identifies specific overt acts that Sadiki-Yisrael is alleged to have committed in furtherance of the RICO conspiracy:

> Between October 6, 2009, and March 15, 2010, Sadiki-Yisrael allegedly caused at least four fraudulent transactions to occur that resulted in excess of $26,013 being deposited into at least one account that he controlled.  [Doc. 1 at 17 (Overt Act 1).]

> From November 1, 2010, through at least November 4, 2010, Sadiki-Yisrael and Gangster Disciples member J.S. allegedly caused at least four fraudulent transactions to occur that resulted in excess of $26,304 being

_____

[1] According to the indictment, members of the Gangster Disciples are organized in geographic groups, each called a "count" or a "deck."  [Doc. 1 at 2.]  Allegedly, a "Governor" is the highest-ranking member within a particular state and is aware of and coordinates much of the criminal activity occurring within that state.  [*Id.* at 3.]

deposited into at least one account controlled by J.S. [Doc. 1 at 18 (Overt Act 3).]

From February 19, 2013, through at least March 18, 2013, co-defendant Ronald McMorris and Sadiki-Yisrael allegedly caused at least five fraudulent transactions to occur that resulted in excess of $10,200 being deposited into at least one account controlled by McMorris. [Doc. 1 at 20 (Overt Act 17).]

From June 20, 2013, through at least August 15, 2013, Sadiki-Yisrael and co-defendant Myrick Stevens allegedly caused at least three fraudulent transactions to occur that resulted in excess of $34,100 being deposited into at least one account controlled by Stevens. [Doc. 1 at 21 (Overt Act 21).]

From July 24, 2013, through at least September 6, 2013, Sadiki-Yisrael and co-defendant Denise Carter allegedly caused at least eleven fraudulent transactions to occur that resulted in excess of $32,341 being deposited into at least one account controlled by Carter. [Doc. 1 at 21-22 (Overt Act 22).]

From August 5, 2013, through at least September 5, 2013, Sadiki-Yisrael and co-defendant Thomas Pasby allegedly caused at least twenty-six fraudulent transactions to occur that resulted in excess of $83,918 being deposited into at least one account controlled by Pasby. [Doc. 1 at 22 (Overt Act 23).]

From August 19, 2013, through at least September 25, 2013, Sadiki-Yisrael and co-defendants Arrie Freeney and Alonzo Walton allegedly caused at least six fraudulent transactions to occur that resulted in excess of $20,307 being deposited into at least one account controlled by Freeney. [Doc. 1 at 22 (Overt Act 25).]

3

On or about September 12, 2013, Sadiki-Yisrael and co-defendant Jeremiah Covington allegedly caused at least one fraudulent transaction to occur that resulted in excess of $19,900 being deposited into at least one account controlled by Covington.  [Doc. 1 at 23 (Overt Act 28).]

Between September 19, 2013, and October 8, 2013, Sadiki-Yisrael and co-defendant Yohori Epps allegedly caused at least eight fraudulent transactions to occur that resulted in excess of $26,304 being deposited into at least one account controlled by Epps.  [Doc. 1 at 23 (Overt Act 30).]

Between October 4 and 21, 2013, Sadiki-Yisrael and co-defendant Kelvin Sneed allegedly caused at least six fraudulent transactions to occur that resulted in excess of $24,417 being deposited into at least one account controlled by Sneed.  [Doc. 1 at 23-24 (Overt Act 31).]

From October 18, 2013, through February 4, 2014, Sadiki-Yisrael and co-defendant Curtis Thomas allegedly caused at least thirty-eight fraudulent transactions to occur that resulted in excess of $108,536 being deposited into at least one account controlled by Thomas.  [Doc. 1 at 24 (Overt Act 32).]

On or about December 25, 2013, Sadiki-Yisrael and co-defendants Shauntay Craig, Alonzo Walton, and Antonio Ahmad, and others allegedly secreted defendant Quiana Franklin from law enforcement after a stash house she ran was raided by police.  [Doc. 1 at 25 (Overt Act 40).]

In January 2014, Walton allegedly recruited individuals to take part in the credit card and bank fraud scheme controlled by Sadiki-Yisrael.  [Doc. 1 at 25 (Overt Act 41).]

4

On or about June 6, 2014, co-defendant Kevin Clayton asked Sadiki-Yisrael for a contact to help smuggle marijuana into a prison.  [Doc. 1 at 27 (Overt Act 51).]

On or about September 19, 2014, defendant Ronald McMorris allegedly deposited $2700 into at least one bank account controlled by Sadiki-Yisrael.  [Doc. 1 at 29 (Overt Act 64).]

At all times relevant to the indictment, co-defendant Michael Drummond allegedly provided names and account information to Sadiki-Yisrael to use in fraudulent transactions.  [Doc. 1 at 40 (Overt Act 130).]

The indictment also provides notice of enhanced sentencing as to Sadiki-Yisrael.  In Paragraph 136, the indictment alleges that Sadiki-Yisrael and other co-defendants joined and remained in the RICO conspiracy charged in Count One knowing and agreeing that members of the enterprise engaged in acts involving murder, in violation of O.C.G.A. § 16-5-1.  [Doc. 1 at 41.]  In Paragraph 137, the indictment alleges that Sadiki-Yisrael and other co-defendants "joined and remained in the RICO conspiracy charged in Count One knowing and agreeing that members of the enterprise manufactured, distributed, and possessed with the intent to distribute controlled substances including more than 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance; more than one kilogram of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance; and

more than five kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance; any of which constitutes a violation of Title 21, United States Code, Section 841, Section 841(b)(1)(A), and Section 846[.]"  [*Id.* at 42.]

## II.     MOTION FOR BILL OF PARTICULARS [751]

In his motion for a bill of particulars, Sadiki-Yisrael requests that the government be ordered to provide the following information:

> 1. Regarding Count 1, state with specificity what Defendant's knowledge or participation was regarding each of the alleged predicate offenses, and identify any facts or allegations linking Defendant to those offenses, including: (A) murder, (B) robbery, (C) extortion, (D) arson, (E) drug trafficking, (F) wire fraud, (G) financial institution fraud, (H) fraud and related activity in connection with access devices, (I) inducing and enticing individuals to travel interstate to engage in prostitution, and (J) obstruction of justice.
>
> 2. For each of the offenses listed above, identify specifically how and when Defendant agreed that a conspirator would commit any act in the conduct of the affairs of the enterprise, and identify any evidence supporting those allegations.
>
> 3. For each of the offenses listed above, identify specifically how any alleged act of racketeering activity benefited the enterprise, and how Defendant knew of, approved of, or participated in any act of racketeering activity, and identify any evidence supporting those allegations.

6

4. For each of the offenses listed above, identify specifically any overt acts on the part of Defendant, and identify any evidence relating to those acts by Defendant.

5. Regarding Paragraph 40, identify specifically Defendant's knowledge and participation in allegedly "secret[ing] defendant QUIANA FRANKLIN from law enforcement after a stash house she ran was raided by police" and identify any evidence supporting those allegations.

6. Regarding Paragraph 51, identify specifically how and when co-defendant Clayton requested information from Defendant relating to the smuggling of marijuana into a prison, and identify any evidence whatsoever linking Defendant to any transaction involving a controlled substance.

7. Regarding Paragraph 136, identify any evidence that Defendant "joined and remained in the RICO conspiracy charged in Count One knowing or agreeing that members of the enterprise engaged in acts involving murder."

8. Regarding Paragraph 137, identify any evidence that Defendant "joined and remained in the RICO conspiracy charged in Count One knowing and agreeing that members of the enterprise manufactured, distributed, and possessed with the intent to distribute controlled substances" including methamphetamine, heroin, cocaine, or any other controlled substance. Identify specific evidence of Defendant's knowledge or participation regarding each substance identified, including names, dates, locations, etc.

[Doc. 751 at 2-4.]   Sadiki-Yisrael asserts that he needs this information to

adequately defend himself in this case, especially since discovery in this case has

been so voluminous and the indictment, in his view, "lumps together numerous co-defendants into broad counts of racketeering conduct without identifying Defendant's involvement" with the specific predicate acts alleged. [*Id.* at 1.]

The government generally responds that Sadiki-Yisrael's requests are an improper attempt to obtain discovery. [Doc. 846 at 9-11] The government nonetheless provides some detail in its response and directs Sadiki-Yisrael to particular evidence produced in discovery for further information. [*Id.*] In response to Request No. 1, the government states, among other things, that its theory is that Sadiki-Yisrael, by virtue of his alleged leadership role within the Gangster Disciples organization, knew that conspirators would commit two racketeering acts. [*Id.* at 9.] In response to Request No. 3, the government points Sadiki-Yisrael to paragraph 19 of the indictment, where the government alleges the manner and means of the alleged RICO conspiracy. [*Id.* at 9-10.] In response to Request No. 4, the government points Sadiki-Yisrael to the overt acts identified in the indictment and states that it intends to rely on evidence produced in discovery or that will be produced under *Jencks*. [*Id.* at 10.] In response to Request No. 5, the government states that its theory concerning Overt Act 40 is that Craig and co-defendant Summers used a house in Birmingham, Alabama, as a stash house and points Sadiki-Yisrael to specific items produced in discovery relating to that Overt

Act.  [*Id.*]  In response to Request No. 6, the government refers Sadiki-Yisrael to specific intercepted communications.  [*Id.* at 11.]  Finally, as to Requests No. 7 and 8, the government generally states that it intends to rely on wire intercepts and co-conspirator testimony and statements to support its notice of enhanced sentencing.  [*Id.*]

Federal Rule of Criminal Procedure 7(f) explains that:

> The court may direct the government to file a bill of particulars.  The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits.  The government may amend a bill of particulars subject to such conditions as justice requires.

Fed. R. Crim. P. 7(f).  The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense."  *United States v. Davis*, 854 F.3d 1276, 1293 (11th Cir. 2017) (citation omitted).  A bill of particulars may not be used for the purpose of obtaining detailed disclosure of the government's case or evidence in advance of trial.  *See United States v. Perez*, 489 F.2d 51, 70-71 (5th Cir. 1973).  "Nor is the defendant entitled to a bill of particulars with respect to information which is already available through other sources such as the

indictment or discovery and inspection." *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir. 2016), *modified on other grounds by*, 801 F.2d 378 (11th Cir. 1986).

The Court agrees with the government that more detailed information about the alleged overt acts and intricacies of the alleged conspiracy is not warranted. *See United States v. Henley*, No. 1:16-cr-151-LMM-JFK, 2017 WL 2952821, at *16 (N.D. Ga. May 19, 2017) (denying motion for bill of particulars seeking details concerning overt acts taken in furtherance of extortion and drug conspiracies), *report and recommendation adopted*, 2017 WL 2918954 (N.D. Ga. July 7, 2017); *United States v. Reid*, No. 3:09-CR-312-J-34TEM, 2010 WL 2653229, at *2 (M.D. Fla. July 2, 2010) (denying request for bill of particulars to specify date when alleged conspiracy was formed and the date on which each defendant joined conspiracy where indictment provided the purpose of the alleged conspiracy, the participation of the defendant in the conspiracy, and the overt acts that defendant allegedly committed, as well as approximate dates of activity); *see also United States v. Leiva-Portillo*, No. 1:06-CR-350-WSD, 2007 WL 1706351, at *14-15 (N.D. Ga. June 12, 2007) (denying motion for bill of particulars where government represented that it had provided extensive discovery materials to defendant responsive to the requests made and that information "sufficiently advise[d]

10

[d]efendant of the specific conduct for which [he] is being prosecuted").  While additional information may be helpful to Sadiki-Yisrael, he has failed to carry his burden to demonstrate that additional details are necessary to enable him to prepare his defense, avoid surprise, or plead double jeopardy in a subsequent proceeding. *See United States v. Giffen*, 379 F. Supp. 2d 337, 346 (S.D.N.Y. 2004) ("The ultimate test in deciding whether a bill of particulars should be ordered is whether the information sought is necessary, as opposed to helpful, in preparing a defense.").  This the Court finds that Sadiki-Yisrael's Requests No. 1 through 4 are without merit.

With respect to Requests No. 5 and 6, it appears that much of the detail that Sadiki-Yisrael seeks by way of a bill of particulars can be discerned from the information that the government has produced in discovery.  Accordingly, the Court declines to order the government to respond further to those requests.

Finally, the Court finds Sadiki-Yisrael's requests for details concerning the sentencing enhancement provisions in the indictment are without merit.  Although the notice provisions do not set out the specifics actions that Sadiki-Yisrael allegedly undertook, the indictment itself contains detail regarding the alleged murder and drug trafficking charges. The Court is satisfied that, with respect to the

11

notices of enhanced sentencing, the government has provided sufficient information to enable Sadiki-Yisrael to understand the government's theory.

For these reasons, Sadiki-Yisrael's Motion for Bill of Particulars [Doc. 751] is **DENIED**.

### III.   MOTION TO DISCLOSE CONFIDENTIAL INFORMANTS [1007]

Sadiki-Yisrael moves the Court to order the government to "disclose all names, addresses, and other identifying and contact information on any informants used in this case." [Doc. 1007 at 1.] Sadiki-Yisrael specifically states that he has learned through discovery that at least one informant, identified as "CHS-1" provided information to law enforcement, including telephone numbers for Sadiki-Yisrael and meeting location of alleged members of the Gangster Disciples. [*Id.*] Sadiki-Yisrael contends that the identity and other information relating to CHS-1 and any other confidential informants is necessary for him to prepare for trial and avoid delays at trial. [*Id.* at 2.] The government has responded to the motion. [Doc. 1068.]

It is well-established that the government has a limited privilege to withhold the identity of law enforcement informants. *Roviaro v. United States*, 353 U.S. 53, 59 (1957). The purpose of this privilege "is the furtherance and protection of the public interest in effective law enforcement." *Id.* But where the disclosure of an

12

informant's identity or the contents of his communication is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the trial court may require disclosure. *Id*. at 60-61. In balancing these interests, the Court must take into account "the particular circumstances of each case, the crime charged, possible defenses, and the potential significance of the informant's testimony." *United States v. Gutierrez*, 931 F.2d 1482, 1490 (11th Cir. 1991). Courts in this Circuit consider the following three factors in evaluating whether the government should be required to reveal the identity of informants: "(1) the extent of the CI's participation in the criminal activity; (2) the directness of the relationship between the defendant's asserted defense and the probable testimony of the CI; and (3) the government's interest in nondisclosure." *United States v. Razz*, 240 F. App'x 844, 847 (11th Cir. 2007) (citing *Gutierrez*, 931 F.2d at 1490).

The concerns in *Roviaro* are generally inapplicable where the government intends to call the informant as a witness at trial. *See Banks v. Dretke*, 540 U.S. 668, 697 (2004) ("The issue of evidentiary law in *Roviaro* was whether (or when) the Government is obliged to reveal the identity of an undercover informer the Government does *not* call as a trial witness."); *United States v. Rook*, No. 1:15-CR-380-SCJ, 2016 WL 2344877, at *3 (N.D. Ga. May 3, 2016); *United States v. Pineda*, No. 1:11-CR-00006-CAP-JFK, 2012 WL 2906758, at *44 (N.D. Ga. June

13

4, 2012), *report and recommendation adopted* , 2012 WL 2907447 (N.D. Ga. July 16, 2012). Here, the government has indicated that it intends to call its confidential informants as witnesses during the trial and will disclose prior to trial the identity of the informant and any related *Jencks* Act, *Brady*, and *Giglio* materials. [Doc. 1068 at 5.] In light of this representation, the Court will not require the government to disclose the identity of such confidential informants at this time.

The Court additionally concludes that Sadiki-Yisrael has not met the second *Roviaro* factor—*i.e.*, a direct relationship between his defense and the probable testimony of the informant. The burden is on the defendant to show that the informant's testimony would significantly aid in establishing an asserted defense. *United States v. Johnson*, 702 F. App'x 815, 816 (11th Cir. 2017) (citing *Gutierrez*, 931 F.2d at 1491). "Mere conjecture about the possible relevance of the testimony is insufficient to compel disclosure." *Id*. Sadiki-Yisrael only generally avers that he would like to have access to the confidential informant to prepare for trial. [Doc. 1007 at 2.] This is insufficient. He has not indicated what information he believes that he would obtain from the confidential informant or why it would materially support his defense. In fact, he does not specify what defense that might be.

For the foregoing reasons, *Roviaro* does not require disclosure of the confidential informant's or informants' identity or identities at this time. Sadiki-

14

Yisrael's Motion to Disclose Confidential Informants is therefore **DENIED**.  [Doc. 1007.]

## IV.   MOTION TO SEVER [1008]

Sadiki-Yisrael moves for severance on the grounds that there is no evidence linking him to the "most grave" predicate acts, including murder, robbery, extortion, drug trafficking, prostitution or obstruction, and that there is a danger of prejudicial spillover that may prevent the jury from sifting through the evidence to make an individualized determination as to him.  [Doc. 1008 at 2-4.]  The government responds that joinder of Sadiki-Yisrael is proper under Federal Rule of Criminal Procedure 8, and that he has failed to carry his burden of demonstrating any actual prejudice that would compel severance under Rule 14.  [Doc. 1089.]

Federal Rule of Criminal Procedure 8(b) provides that joinder of defendants is proper "if they are alleged to have participated in the same . . . series of acts or transactions constituting an offense or offenses."  To meet the "same series of acts or transaction" requirement of Rule 8(b), the government must demonstrate that the acts alleged are united by substantial identity of facts or participants; however, there is no requirement that each participant participate in all acts or even know the other participants' roles in the alleged activities.  *United States v. Holloway*, 971 F.2d 675, 679 (11th Cir. 1992).

15

Joinder is proper where, as here, the indictment charges multiple defendants with participation in a single conspiracy. *See United States v. Alvarez*, 755 F.2d 830, 857 (11th Cir. 1985). The general rule is that defendants indicted together should be tried together, especially in conspiracy cases. *United States v. Chavez*, 584 F.3d 1354, 1360 (11th Cir. 2009). "Joint trials play a vital role in the criminal justice system and serve important interests: they reduce the risk of inconsistent verdicts and the unfairness inherent in serial trials, lighten the burden on victims and witnesses, increase efficiency, and conserve scarce judicial resources." *United States v. Lopez*, 649 F.3d 1222, 1233 (11th Cir. 2011).

To the extent that Sadiki-Yisrael contends that he has been improperly joined as a defendant because he was involved only in alleged acts of financial fraud rather than "more grave" (and violent) predicate acts, that argument is without merit. Rule 8(b) is a pleading rule, and courts look to the indictment to determine whether joinder is proper under that rule. *See United States v. Liss*, 265 F.3d 1220, 1227 (11th Cir. 2001); *United States v. Melvin*, 143 F. Supp. 3d 1354, 1363 (N.D. Ga. 2015). The indictment alleges that Sadiki-Yisrael was a member of the Gangster Disciples, that he held a position of leadership at the local and state level, and that he was involved in offenses in furtherance of a racketeering conspiracy.

16

Accordingly, the Court concludes that Sadiki-Yisrael has been properly joined as a defendant in this case.

Because joinder is proper under Rule 8(b), the Court turns to Sadiki-Yisrael's contention that he should be severed due to prejudicial spillover. Federal Rule of Criminal Procedure 14 allows for severance if it appears that a defendant will be prejudiced by a joinder of offenses or defendants. "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). The Eleventh Circuit has explained that "[s]everance . . . is warranted only when a defendant demonstrates that a joint trial will result in 'specific and compelling prejudice' to his defense." *Liss,* 265 F.3d at 1228 (citation omitted). "Compelling prejudice occurs when the jury is unable 'to separately appraise the evidence as to each defendant and render a fair and impartial verdict.'" *Id*. (quoting *United States v. Meester*, 762 F.2d 867 (11th Cir.1985)). Cautionary instructions to the jury are presumed to adequately safeguard against prejudice. See *Lopez*, 649 F.3d at 1235 (cautionary instructions to the jury "ordinarily will mitigate the potential spillover effect of evidence of a co-defendant's guilt").

17

The Court is not persuaded that the nature of Sadiki-Yisrael's involvement in the alleged conspiracy warrants severance under Rule 14. Sadiki-Yisrael's concern that a jury will be unable to sift through the evidence at trial and make an individual determination of guilt as to him is a concern in virtually any multi-defendant conspiracy case where the participants have disparate levels of alleged involvement. As the Eleventh Circuit has explained, the general rule favoring joinder of defendants who have been indicted together applies to coconspirators, even if one defendant had a minimal level of participation in the conspiracy. *United States v. Leavitt*, 878 F.2d 1329, 1340 (11th Cir. 1989) ("In a conspiracy case, coconspirators should usually be tried together; the fact that a defendant only participated in one aspect of the conspiracy does not by itself warrant severance."). Whatever risk there may be can likely be cured through limiting instructions to the jury. *See Zafiro*, 506 U.S. at 539. Accordingly, at this point, the Court concludes that Sadiki-Yisrael has not demonstrated that he would suffer such compelling prejudice to mandate severance.

For the foregoing reasons, it is **RECOMMENDED** that Sadiki-Yisrael's Motion to Sever [Doc. 1008] be **DENIED** at this time. It bears mentioning, however, that severance is within the discretion of the trial judge, who must ultimately balance the efficient and orderly presentation of the case with the

possibility of prejudice to defendants and the ability to cure such prejudice with instructions.  This is a complex case involving many defendants and issues may arise as this matter moves toward trial that may justify another look at severance of this and other defendants for trial.  Although I recommend denying the motion at this stage in the proceedings, the trial judge may, of course, revisit the question of severance closer to trial.  *See United States v. Alcindor*, No. 1:05-CR-0269-TWT-CCH, 2005 WL 8148993, at *5 (N.D. Ga. Dec. 7, 2005) (denying motion for severance but noting that severance is within the province of the trial judge), *report and recommendation adopted*, 2006 WL 8426658 (N.D. Ga. Mar. 10, 2006).

## V.    MOTION TO SUPPRESS EVIDENCE [1010, 1020]

Sadiki-Yisrael has filed a motion to suppress evidence seized from his residence located at 16 Camden Woods Place in Dallas, Georgia (the "Residence") on May 4, 2016, in connection with his arrest.  [Docs. 1010, 1020.]  Sadiki-Yisrael challenges the search on three grounds.  First, he maintains that law enforcement began searching the Residence prior to the issuance of a search warrant, and during that time, seized "numerous electronic devices and other physical evidence."  [Doc. 1020 at 1.]  Second, he argues that agents unreasonably delayed obtaining the search warrant.  [*Id.* at 2.]  Third, he argues that the search warrant applications and affidavits for the Residence and a Pontiac Grand Prix (the "Vehicle") located at the

19

Residence were insufficient to provide a nexus between Sadiki-Yisrael and either the Residence or the Vehicle. (*Id.*[2])

On November 17, 2017, an evidentiary hearing on the motion was held before me. [Doc. 1284-1 (Transcript).[3]] FBI Agent Mark Richards, who was part of the arrest team and present during the protective sweep, and FBI Special Agent Megan Perry, who was part of the search team that later searched the residence, testified at the hearing. Sadiki-Yisrael also testified; however, on cross-examination he declined to answer a question, invoking the Fifth Amendment. On the government's motion, the Court struck his testimony. [Hr'g Tr. at 44-45.] Following the hearing, Sadiki-Yisrael filed a post-hearing brief, [*see* Doc. 1284], the government filed a response [*see* Doc. 1301], and Sadiki-Yisrael filed a reply [*see* Doc. 1312].

### A.    Background

On May 4, 2016, at approximately 6:00 in the morning, an arrest team entered the Residence and arrested Sadiki-Yisrael on a federal arrest warrant. (Hr'g

---

[2] The search warrant and application for the Residence is docketed at Doc. 1020-1, and the search warrant and application for the Vehicle is docketed at Doc. 1020-2. References to pages of the search warrant materials are to the page numbers automatically generated by CM/ECF.

[3] References to the transcript are noted as "Hr'g Tr. at __."

Tr. at 6, 8-9.)   The entry team agents consisted of approximately 15 SWAT members.  (*Id.* at 8.)  Agents located Sadiki-Yisrael in the master bedroom.  (*Id.*) Shanera Banks and her minor child were also located within the Residence.  (*Id.* at 9, 14-15.)   The agents who arrested Sadiki-Yisrael remained with him in the bedroom while other occupants of the Residence were located and a protective sweep conducted.  Agents also conducted a protective sweep of the Residence to ensure that there were no other individuals associated with Sadiki-Yisrael who may have posed a threat.  (*Id.* at 11.)  In all, it took 90 to 120 seconds to conduct the sweep of the Residence.  (*Id.* at 22.)  During the sweep, Agent Richards was in communication with the case agent, FBI Special Agent Buddy Early, and reported what he observed in plain view as he moved throughout the Residence, including items relating to gang affiliation and a laptop.  (*Id.* at 19-20, 23.)

After the entry team placed Sadiki-Yisrael in handcuffs, he was moved to main living area of the Residence, where investigative agents, who were not part of the entry team, took custody of him.  (Hr'g Tr. at 13-14).  Sadiki-Yisrael was then moved outside and, about 45 to 50 minutes after the arrest, was transported to another location for booking.  (*Id.* at 14.)  At approximately 6:35 a.m., Banks and the minor child left the Residence with Banks's mother.  (*Id.* at 16.)  At around 7:20 a.m., the Residence was secured, and all law enforcement agents exited the

Residence.  (*Id.* at 18.[4])  In the meantime, law enforcement applied for a search warrant for the Residence.  (*Id.* at 18-19.)

Later in the day, Ms. Banks returned to the Residence to retrieve some personal items.  (Hrg. Tr. at 17.)  Agent Perry and another agent escorted Ms. Banks inside the Residence to retrieve the items.  (*Id.* at 17, 29, 39.)  The entry took around ten minutes.  (*Id.* at 39.)

At 3:50 p.m. and 3:52 p.m. on May 4, 2016, the Honorable Janet F. King, U.S. Magistrate Judge, signed search warrants for the Residence and the Vehicle, respectively.  [Doc. 1020-1 at 2; 1020-2 at 2.]  After the warrants were issued, agents, including Agent Perry, who was on the search team, re-entered the Residence and conducted the search.  (Hr'g Tr. at 19, 33-34.)

**B.    Discussion**

**1.    The Protective Sweep of the Residence Was Constitutional**

The Supreme Court has defined a "protective sweep" as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of

---

[4] Agent Richards testified, based on his recollection, that the Residence was secured at 8:00, but his report indicated that it was at 7:20.  This discrepancy of only forty minutes is not material, and indeed, is not unsurprising given the length of time that has elapsed since the search.

police officers and others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). "It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* Officers may search closets and spaces immediately adjoining the place of arrest without probable cause or reasonable suspicion. *Id.* at 334. But to search outside the immediate area of arrest, officers must have articulable facts that would cause a reasonably prudent officer to believe that the area to be swept harbors a person that poses a threat. *Id.*

Sadiki-Yisrael does not appear to contest that agents could lawfully conduct a protective sweep of the Residence in connection with their execution of the arrest warrant.[5] Sadiki-Yisrael instead focuses on the scope of the sweep. He argues that the sweep was neither quick nor limited, as agents remained in the Residence for at least an hour and twenty minutes after they made entry. [Doc. 1284 at 8.] Such a length of time, he contends, was unjustified and "strongly indicates that a Fourth

---

[5] In an abundance of caution, the Court notes that agents could lawfully perform a protective sweep of the Residence because agents had reasonable suspicion that a dangerous individual may have been present in the Residence. Specifically, Agent Richards testified that prior to the arrest, he familiarized himself with the indictment in this case, which alleged multiple murders and other acts of violence and that Sadiki-Yisrael was allegedly a leader of the Gangster Disciples. (Hr'g Tr. at 13.) It was therefore reasonable to assume that there may be other individuals in the Residence who could pose a threat to the agents' safety.

Amendment violation occurred, as the Government cannot identify any valid reason for the agents to have remained inside the Residence for that amount of time." [*Id.*]

Sadiki-Yisrael's argument is not persuasive. The fact that the Residence was unsecured and that agents were within the Residence from 6:00 a.m. to 7:20 a.m. does not mean that agents were conducting a search the entire time. Agent Richards testified credibly that the sweep lasted between a minute-and-a-half and two minutes, and during that time, he observed in plain view gang memorabilia and other items marked with gang indicia. Also during this time agents arrested Sadiki-Yisrael, advised him concerning what the next steps would be, and removed him, Ms. Banks, and the minor child from the house. In all, Agent Richards estimated that 45 to 50 minutes elapsed before Sadiki-Yisrael was transported from the scene. (Hr'g Tr. at 14.) In the following 30 to 35 minutes, Agent Richard testified that he was communicating with Special Agent Early concerning items observed in the residence during the sweep. (*Id.* at 25-26.)

Sadiki-Yisrael also appears to contend that the government prolonged the sweep by remaining in the Residence to document the evidence. Agents may lawfully "seize any evidence they discovered in plain view within the proper scope of the protective sweep," provided the seizure is within the confines of the plain

view doctrine.  *United States v. Tobin,* 923 F.2d 1506, 1513 (11th Cir. 1991) (en banc) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971)); *see also Horton v. California*, 459 U.S. 128, 136-37 (1990).  If agents could lawfully seize and use evidence to obtain a search warrant, then there is no compelling reason why agents could not take a reasonable amount of time to revisit the items observed in plain view to describe them in more detail to prepare a search warrant application, before securing and leaving the Residence.  *See United States v. Jackson*, 618 F. App'x 472, 478 (11th Cir. 2015).  Nor were the agents required to ignore, in preparing the search warrant application, that they had seen computers and other items of potential evidentiary value in the house during the arrest and protective sweep.

Sadiki-Yisrael also argues that the testimony of the government's witnesses was not credible.  [Doc. 1284 at 4-6.]  He maintains that it is not believable that the 15 entry team members plus the additional evidence response team members who arrived on the scene at 7:00 p.m. waited patiently until 4:00 p.m. to obtain a search warrant.  [*Id.* at 5.]  He further argues that the search warrant application described items with such detail that agents must to have performed a full-on search.  [*Id.*]  Sadiki-Yisrael also points to Agent Perry's testimony that the kitchen was in

disarray and her admission that when her search team entered the kitchen, someone had already been there and searched the kitchen.  [*Id.* at 6 (citing Hr'g Tr. at 39).]

Sadiki-Yisrael overstates Agent Perry's testimony.  Although she testified that the kitchen had been searched before her team got to that room, it does not necessarily follow that the first search occurred before the search warrant was secured.  Indeed, Agent Perry also testified that one of the other search teams (there were multiple ones involved in the search) had already searched the kitchen.  (*See* Hr'g Tr. at 39.)  She also stated that once a room has been searched, the search team signs a piece of paper on the wall indicating that the room had been searched, and that someone's name was on the piece of paper indicating that the kitchen had been searched.  (*Id.* at 39-40.)  Agent Perry's testimony—which was credible— indicates that the most reasonable explanation is that the kitchen was searched after the warrant issued, but that another search team searched the room before her team got there.  Finally, the evidence described in the warrant does not suggest that agents performed a full-on search before issuance of the search warrant.  Special Agent Early stated in his affidavit in support of the search warrant that during their protective sweep, officers observed (1) a Gangster Disciples jacket in an upstairs bedroom that bore a Gangster Disciples logo; (2) a laptop computer in an upstairs bedroom; and (3) in the basement, several items of Gangster Disciples

26

paraphernalia including: framed photographs of alleged Gangster Disciples members making gang signs, a 'Certificate of Appreciation' for 'Iz' from the 'GState,' a banner for 'LTG Radio' and a computer."[6]   [Doc. 1020-1 at 17.] Contrary to Sadiki-Yisrael's argument, there is nothing about these items that suggests that they were not in plain view.

In sum, the Court concludes that the protective sweep was lawful; thus, there is no basis to suppress the items ultimately seized pursuant to the search warrants.

### 2.   There Was No Unreasonable Delay in Obtaining the Warrants

Sadiki-Yisrael argues that securing the Residence for over nine hours without a showing of exigency violated the Fourth Amendment was an unreasonable seizure.[7]   [Doc. 1312 at 2.]  He further maintains that the government has not shown that securing the Residence for such a period was necessary to

---

[6] According to Special Agent Early's affidavit, "LTG" stands for "Loyal to the Gang," the name of the count for which Sadiki-Yisrael was the alleged leader. [Doc. 1020-1 at 17.]  LTG Radio was also allegedly the name of one of the bank accounts into which fraudulently-obtained monies were channeled.  [*Id.* at 12.]

[7] Sadiki-Yisrael did not raise this argument in his post-hearing brief; thus, the Court could well determine that he had abandoned it.  Nonetheless, in an abundance of caution, the Court addresses the argument as raised in his post-hearing reply brief.

27

prevent the destruction or removal of evidence therefrom.  [*Id.*]  The Court finds

these argument wholly unpersuasive.

"A temporary warrantless seizure supported by probable cause is reasonable

as long as 'the police diligently obtained a warrant in a reasonable period of time.'"

*United States v. Laist*, 702 F.3d 608, 613 (11th Cir. 2012) (quoting *Illinois v.*

*McArthur*, 531 U.S. 326, 334 (2001)).   "To determine if the intrusion was

reasonable under the Fourth Amendment, courts must evaluate the totality of the

circumstances presented in each case, balancing the privacy-related and law-

enforcement-related concerns."  *United States v. Morgan*, __ F. App'x __, ___,

2017 WL 4790883, at *2 (11th Cir. Oct. 24, 2017) (citing *Laist*).  Factors that the

Court should consider include:  (1) the significance of the interference with the

person's possessory interest; (2) the duration of the delay; (3) whether the person

consented to the seizure; (4) the government's interest in holding the property as

evidence; (5) the nature and complexity of the investigation, including whether law

enforcement resources were necessarily diverted to other matters; (6) the quality of

the warrant application and the amount of time the court would expect such a

warrant would take to prepare; and (7) any other evidence proving or disproving

law enforcement's diligence in obtaining the warrant.  *Laist*, 702 F.3d at 613-14.

The duration between a seizure and obtaining a search warrant is a fact-intensive

inquiry, "and it is therefore unwise to establish a duration beyond which a seizure is definitively unreasonable or, as discussed below, even presumptively unreasonable." *Id.*

Sadiki-Yisrael does not address any of these factors in any of the briefs that he has filed in support of his motion to suppress, except to point out that it took around nine hours to obtain the search warrant for the Residence.  His argument boils down to an *ipse dixit* assertion that a nine or ten hour delay in obtaining the search warrants was unconstitutional.  Of course, there is no bright-line rule that requires such a gap in time is constitutional.

Considering the *Laist* factors leads to the inescapable conclusion that the agents' securing of the Residence for around ten hours while a warrant was applied for an obtained was not an unreasonable delay.  Significantly, securing the residence did not interfere with Sadiki-Yisrael's possessory interest in the residence because he was taken into custody almost immediately after agents entered the Residence at 6:00 a.m., and he remained in custody thereafter.  (Hr'g Tr. at 8, 14.)  Likewise, Ms. Banks was permitted to return to and enter the Residence to retrieve personal items while the Residence was secured.  (*Id.* at 17.)  Moreover, the government had a strong interest in securing the residence.  The agents' protective sweep revealed numerous items of apparent evidentiary value,

and it was reasonable to believe, based on the agents' belief that Sadiki-Yisrael was a member of the Gangster Disciples organization, that simply leaving the Residence unsecured created a risk that evidence could be destroyed or secreted away.  In addition, the record shows that agents were diligent in obtaining information for the search warrants, and there is no evidence to suggest that agents purposefully delayed obtaining the warrants or acted in bad faith.  Nor is there evidence that they took advantage of the gap to conduct an unlawful search—to the contrary, the agents all vacated the Residence after 7:20, except for when Ms. Banks returned to retrieve her personal items.  In addition, the agents worked during the six o'clock and seven o'clock hours to relate the information that they observed during the protective sweep to the prosecutors, who were "very busy that morning" because there were other arrests taking place in Georgia and elsewhere relating to this case (*Id.* at 7, 24.)  The two warrant applications themselves were lengthy and detailed, both in terms of the facts proffered to establish probable cause as well as the descriptions of things to be searched.  Applying the *Laist* factors to the record before the Court, the Court readily concludes that approximate nine-hour period

during which the Residence was secured in order to obtain the search warrants was not so unreasonable to justify suppression.[8]

### 3.     The Warrants Sufficiently Establish Probable Cause to Search the Residence and the Vehicle

Finally, Sadiki-Yisrael argues that "insufficient facts were provided to the Magistrate [Judge] to find a nexus between Defendant and this Residen[c]e in order to support a finding of probable cause as to the Residence and any vehicles on the premises."[9]  [Doc. 1312 at 1.]  Like his argument about the purported delay in obtaining the search warrants, this argument is simply one of assertion, without any specifics.  Nonetheless, the Court concludes that the search warrant applications

---

[8] The sole case on which Sadiki-Yisrael relies, *Segura v. United States*, 468 U.S. 796 (1984), actually supports the Court's conclusion.  In that case, agents secured an apartment for 19 hours while awaiting a search warrant to issue.  *Segura*, 468 U.S. at 812.  Similar to the case at bar, there was no suggestion that agents acted in bad faith purposefully delayed issuing the warrant, nor was there evidence that agents "in any way exploited their presence in the apartment; they simply awaited issuance of the warrant."  *Id.*  In addition, the individuals who had possessory interests in the apartment were in custody; thus, any interference was "virtually nonexistent."  *Id.* at 813.

[9] Similar to his argument about the time it took for agents to obtain a warrant, Sadiki-Yisrael did not brief this issue in his initial post-hearing brief, so the Court could conclude that the argument was abandoned.  In the interest of completeness, however, the Court will consider the argument.

amply demonstrate probable cause that there was evidence relating to Sadiki-Yisrael's alleged criminal activity in the Residence and the Vehicle.

A judicial officer considering an application for a search warrant must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him or her, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The Eleventh Circuit has "established the following guidelines for determining the validity of a warrant affidavit: (1) demonstration of a connection between the defendant and the location to be searched; (2) demonstration of a link between the location and criminal activity; and (3) demonstration of the informant's veracity and basis of knowledge." *United States v. Davis*, 313 F.3d 1300, 1303 (11th Cir. 2002) (per curiam).

Here, the search warrant applications—which rely on identical affidavits executed by Special Agent Early—meet these guidelines.[10] Sadiki-Yisrael was found within the Residence when he was arrested, and the Vehicle was parked in the driveway within the curtilage of the Residence. The affidavit indicated that the

---

[10] Because the affidavits in support of the search warrant applications are identical, I cite only the affidavit in support of the search warrant for the Residence, Doc. 1020-1.

basement of the Residence contained items of Gangster Disciples paraphernalia, including photographs, a certificate of appreciation for "Iz", and a banner for "LTG radio." [Doc. 1020-1 at 17.] The affidavit further noted that a jacket bearing the Gangster Disciples logo was discovered in a bedroom. [*Id.*] Regarding the Vehicle, the affidavit stated that agents observed a black bandana, which is commonly used by members of the Gangster Disciples. [*Id.* at 16, 20.] Also, on the hood of the car was a six-point star emblem, one of the symbols of the Gangster Disciples. [*Id.* at 16, 20.] It does not appear that information obtained from an informant was used to obtain the warrants, but instead from law enforcement agents, intercepted communications, and other reliable sources of information, such as bank records.

In sum, the applications for the search warrants for the Residence and the Vehicle articulate ample grounds to support a finding of probable cause. Accordingly, Sadiki-Yisrael's challenge is without merit.

## VI.  CONCLUSION

For the foregoing reasons, it is **ORDERED** that the Motion for Bill of Particulars [Doc. 751] and Motion to Disclose Confidential Informants [Doc. 1007] be **DENIED**. It is also **RECOMMENDED** that the Motion to Sever [Doc. 1008] and the Motion to Suppress Evidence [Docs. 1010, 1020] be **DENIED.**

33

IT IS SO ORDERED and RECOMMENDED this 18th day of January, 2018.


_____

JOHN K. LARKINS III
United States Magistrate Judge